# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:18-cr-500-SI |
| v. | **OPINION AND ORDER** |
| **TEONDRE ANTONIO BONNER**, | |
| Defendant. | |

Billy J. Williams, United States Attorney, Leah K. Bolstad and Thomas H. Edmonds, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Ruben L. Iniguez and Ryan Costello, Assistant Federal Public Defenders, OFFICE OF THE FEDERAL PUBLIC DEFENDER, 101 SW Main Street, Suite 1700, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Teondre Antonio Bonner ("Bonner") has moved to suppress all physical evidence seized by, and related statements made to, officers of the Portland Police Bureau during their warrantless search of the rental car that Bonner was driving on August 10, 2018. Bonner was alone in the rental car, driving with the permission of the renter but without the authorization of the rental car company, when he was stopped by police officers for a traffic violation. The Court held an evidentiary hearing on April 24 and 25, 2019, hearing testimony from four Portland

police officers and two employees of Dollar Rent-a-Car ("Dollar") and receiving related exhibits. The Government opposes Bonner's motion, arguing primarily that Dollar, as the owner of the rental car, consented to the officers' request to search after being told by the officers that Bonner was in possession of the vehicle. Dollar informed the officers that Bonner was not an authorized driver under Dollar's rental contract, and Dollar requested that the car be repossessed. The Government also argues that after Dollar requested that the officers impound the rental car and return it to Dollar, the inevitable discovery doctrine independently supports denying Bonner's motion. For the reasons that follow, Bonner's motion to suppress is granted.

## STANDARDS

### A. Fourth Amendment Generally

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. amend. IV. "Few protections are as essential to individual liberty as the right to be free from unreasonable searches and seizures." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018). Whether an individual has a Fourth Amendment privacy interest depends on whether that individual possesses a reasonable expectation of privacy in the area searched or the items seized. *California v. Greenwood*, 486 U.S. 35, 39 (1988); *Katz v. United States*, 389 U.S. 347 (1967).

An individual may have a reasonable expectation of privacy in an automobile, *Delaware v. Prouse*, 440 U.S. 648, 662 (1979), although the Supreme Court has acknowledged that "there is a diminished expectation of privacy in automobiles, which often permits officers to dispense with obtaining a warrant before conducting a lawful search." *Byrd*, 138 S. Ct. at 1526 (citing *California v. Acevedo*, 500 U.S. 565, 579 (1991)). The Supreme Court held in *Byrd*, however, that a driver of a rental car may have an objectively reasonable expectation of privacy in the car, even when he or she is not listed as an authorized driver on the rental agreement and is driving the vehicle alone. *Id.* at 1531. When an individual has a reasonable expectation of privacy, law

enforcement may not conduct a search absent a search warrant, consent, or some other exception to the warrant requirement. *See Kentucky v. King*, 563 U.S. 452, 459.

**B. Consent to Search by Third Party**

One exception to the warrant requirement is when a search is performed with valid consent. *See United States v. Matlock*, 415 U.S. 164, 165-66 (1974). If a third party consents to the search, the government has the burden of establishing the effectiveness of that party's consent. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). "The Supreme Court has ruled that consent to a search must be made by an individual with common authority over the property." *United States v. Kim*, 105 F.3d 1579, 1582 (9th Cir. 1997) (citing *Matlock*, 415 U.S. at 164)).

*Matlock* explained that "common authority" is not synonymous with property ownership:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, *see Chapman v. United States*, 365 U.S. 610, (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California*, 376 U.S. 483 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes.

*Matlock*, 415 U.S. at 171 n.7 (citations shortened). The Supreme Court has further noted that

> the "right" to admit the police to which *Matlock* refers is not an enduring and enforceable ownership right as understood by the private law of property, but is instead the authority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness in specific circumstances.

*Georgia v. Randolph*, 547 U.S. 103, 120-21 (2006). In *Randolph*, the Supreme Court described facts where "no common authority could sensibly be suspected":

> A person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant. *See Chapman v. United States, supra* (landlord); *Stoner v. California*,

> *supra* (1964) (hotel manager). A tenant in the ordinary course does
> not take rented premises subject to any formal or informal
> agreement that the landlord may let visitors into the dwelling,
> *Chapman, supra*, at 617, and a hotel guest customarily has no
> reason to expect the manager to allow anyone but his own
> employees into his room, *see Stoner, supra*, at 489; *see also United
> States v. Jeffers*, 342 U.S. 48, 51 (hotel staff had access to room for
> purposes of cleaning and maintenance, but no authority to admit
> police). In these circumstances, neither state-law property rights,
> nor common contractual arrangements, nor any other source points
> to a common understanding of authority to admit third parties
> generally without the consent of a person occupying the premises.

*Id.* at 112 (citations shortened).

The Ninth Circuit has consistently held that a third party who does not have "mutual use of the property" by "joint access or control for most purposes" lacks the authority to consent to a search. *See, e.g.*, *United States v. Warner*, 843 F.2d 401, 403 (9th Cir. 1988) (holding that a landlord's consent to search was insufficient even when the tenant gave permission to the landlord to enter the premises in his absence because landlord did not have "right of access for most purposes"); *United States v. Impink*, 728 F.2d 1228, 1233 (9th Cir. 1984) (holding that consent-giver whose right of access was "narrowly proscribed" lacked authority to consent to a search). The cases upholding third-party consent searches "generally rely on the consent-giver's unlimited access to property to sustain the search." *Kim*, 105 F.3d at 1582 (citing *United States v. Guzman*, 852 F.2d 1117, 1122 (9th Cir. 1988)). The joint access and mutual use doctrine applies in the context of a third-party's consent to the search of a rental car. *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993).

The government may also establish effective consent by means of the apparent authority doctrine. Under that doctrine, a search "is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent." *United States v. Arreguin*, 735 F.3d 1168, 1175 (9th Cir. 2013).

PAGE 4 – OPINION AND ORDER

This doctrine, however, is "applicable only if the facts believed by the officers to be true would justify the search as a matter of law" and a "mistaken belief as to the law, no matter how reasonable, is not sufficient." *Welch*, 4 F.3d at 764-65.

Finally, "a physically present inhabitant's express refusal of consent to a police search [of a rental unit] is dispositive as to him, regardless of the consent of a fellow occupant." *Randolph*, 547 U.S. at 122-23. "The significance of such a refusal turns on the underpinnings of the co-occupant consent rule, as recognized since *Matlock*." *Id.* at 109.

**C. Inevitable Discovery and Inventory Search**

The inevitable discovery doctrine acts as an exception to the exclusionary rule and permits the admission of otherwise excluded evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police." *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)). In some circumstances, the inevitable discovery doctrine may apply because evidence "would have been discovered through a lawful inventory procedure." *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986).

When inventory searches are in fact conducted, the "actual motivations [of law enforcement] *do* matter." *United States v. Orozco*, 858 F.3d 1204, 1210 (9th Cir. 2017) (emphasis in original). The Ninth Circuit therefore requires that when inventory or other programmatic searches are conducted by law enforcement, a court must

> inquir[e] into an officer's purpose in conducting a stop or search without reasonable suspicion or probable cause, when such an intrusion is sought to be justified pursuant to the administrative search doctrine, and where the defendant has come forward with objective evidence to suggest that the intrusion was not made for the purpose of enforcing the administrative inspection scheme.

*Id.* at 1212-13. The mere "presence of a criminal investigatory motive" or a "dual motive—one valid, and one impermissible" does not render an administrative stop or search invalid; instead, the Court must determine whether the challenged search or seizure "would . . . have occurred in the absence of an impermissible reason." *Id.* In *Orozco*, the Ninth Circuit reversed the denial of the defendant's motion to suppress and vacated his judgment of conviction "because the objective evidence clearly demonstrates that, but for the officers' belief that Orozco might be carrying drugs, the stop never would have happened." *Id.* at 1210; *see also United States v. Johnson*, 889 F.3d 1120, 1127-28 (9th Cir. 2018) (holding that the district court erred in denying motion to suppress and that officers' search and seizure of evidence could not be justified under inventory-search doctrine "because the officers themselves *explicitly admitted* that they seized items from the car in an effort to search for evidence of criminal activity.").

## FINDINGS OF FACT

Based on a preponderance of the evidence, the Court finds the following facts:

1. On August 10, 2018, at approximately 5:20 p.m., Portland Police Sergeant Kenneth Duilio was working as the supervisor for the Gang Enforcement Team's ("GET") afternoon shift. His partner, Steven Wilbon, was working as a Sergeant and was assigned to the uniform GET. Sergeant Wilbon was the driver of their patrol vehicle, an unmarked black Police SUV, equipped with lights and siren. ECF 41 at 11-14.

2. The two GET officers were traveling eastbound on NE Ainsworth Street at NE 15th Avenue when they observed a tan 2018 Subaru Outback wagon. ECF 41 at 14.

3. The officers recognized the driver and single occupant as Teondre Bonner, who the officers believed to be a "Rollin 60's Gang Member." ECF 41 at 14-15.

4. Sergeant Wilbon was aware of a law enforcement "flyer" that identified Bonner as part of an investigation as describing Bonner as a passenger in a vehicle in which law enforcement found a firearm under Bonner's seat. ECF 41 at 17.

5. Based on the knowledge gained from the flyer and the belief that Bonner was affiliated with a gang, Sergeant Wilbon stated to Sergeant Duilio that "this is a time that if we find an opportunity to contact Mr. Bonner and prevent a future crime or shooting, that's our responsibility." ECF 41 at 19.

6. The officers followed the car that Bonner was driving and observed Bonner's driver-side wheels cross the yellow line on three occasions. The officers also observed that Bonner exceeded the posted speed limit as he proceeded onto an on-ramp. ECF 41 at 19-22.

7. The officers then initiated a traffic stop. Officers David Hughes and Michael Sherwood arrived as cover in a separate police car. Sergeant Wilbon and Officer Hughes approached the driver's side of Bonner's car. Sergeant Duilio and Officer Sherwood walked to the passenger's side of the car. ECF 41 at 23-24; 99.

8. Sergeant Wilbon asked Bonner for his driver's license, car registration, and proof of insurance. Bonner handed Sergeant Wilbon his driver's license and other papers, including a rental-car agreement. Sergeant Wilbon handed the documents to Officer Hughes, who proceeded to his police vehicle to conduct a records check on Bonner and the car that he was driving. ECF 41 at 30-35.

9. While Officer Hughes conducted the records check, Sergeant Wilbon continued to speak with Bonner. Sergeant Wilbon "ultimately requested consent to search Bonner's vehicle, simply to assure he was not in possession of anything illegal." ECF 21 at Ex. B 4-5.

10. Bonner denied consent to search. ECF 41 at 63.

11. Sergeant Wilbon's "desire to search the car" "arose during the investigation when [Sergeant Wilbon] asked for consent" from Bonner. Sergeant Wilbon suspected at that time that it was probable that Bonner had a gun with him. ECF 41 at 50.

12. Bonner told Sergeant Wilbon that the car Bonner was driving was a rental car. ECF 41 at 33.

13. The car that Bonner was driving had been rented from Dollar.

14. Sergeant Wilbon went to Officer Hughes to tell him that the car Bonner was driving was a rental. ECF 41 at 33.

15. Meanwhile, Officer Hughes conducted a records check and learned that Bonner had a valid operator's license and no warrants for his arrest. ECF 41 at 90-91.

16. Officer Hughes noted that the rental agreement paperwork identified the car's renter as "Hali D. Porter" and showed the return date to be August 9, 2018 (the day before the stop). ECF 41 at 126.

17. Officer Hughes "decided to contact the rental company, Dollar, to inquire about the vehicle, if it was overdue, or who had authorization to drive the vehicle." ECF 41 at 127.

18. While Officer Hughes was speaking with a representative from Dollar, the rental company, Sergeant Wilbon returned to Officer Hughes and informed Hughes that Bonner had said the car was a rental, that Bonner's girlfriend "Hali" was the renter, and that Bonner did not believe the car was overdue. ECF 41 at 130-31.

19. Officer Hughes reached Dollar employee and rental agent Kyle Miller by telephone. ECF 21 at Ex. D.

20. Miller told Officer Hughes that "the vehicle rental had been extended to [the next day, August 11]" and "confirmed that the vehicle had been rented to Hali D. Porter." ECF 21 at Ex. D.

21. Officer Hughes suggested to Miller that the police search the car and requested Dollar's consent to search. It was not Miller who "offered the idea that [the police] could search the car." ECF 41 at 161. At some point during that call, Miller gave Dollar's consent to search the car. ECF 41 at 164.

22. Miller put Officer Hughes on hold and called his supervisor, Chelsea Brockman. Miller told Brockman that "the car was stopped with an unauthorized user; that the cops were looking to search the vehicle and [asked] what she wanted to do." ECF 41 at 192.

23. Brockman testified that she recalled the conversation with Miller and that Miller stated that "the police had called him and that they had a car pulled over with an unauthorized driver and had asked me if it was okay for them to search the car." ECF 41 at 211.

24. Several minutes later, Miller got back on the line with Officer Hughes, and Miller stated that he spoke with his supervisor and that "the company [Dollar] wanted the vehicle back." ECF 41 at 132-33.

25. Officer Hughes informed Sergeant Duilio and Sergeant Wilbon that he had spoken to Miller, and that Dollar had given the officers permission to search the car and that Dollar wanted its rental car back. ECF 41 at 135-36.

26. Officer Hughes informed Bonner that Dollar wanted the rental car back and told Bonner to exit the car. ECF 41 at 136.

27. As Bonner was getting out of the car, Officer Hughes patted him down but found no weapons. ECF 41 at 137.

28. The Officers began searching the car. Officer Hughes opened the lid to the center console and saw a revolver inside. ECF 41 at 137-38. The Officers placed Bonner under arrest. ECF 41 at 40.

29. The revolver was later logged as "evidence." ECF 26 Ex. J.

30. Sergeant Duilio noticed a backpack on the rear passenger floor, and Sergeant Duilio opened it and located several items inside, including clothing, sunglasses, and a "book-sized package" that the officers field-tested. The package was confirmed as containing cocaine. ECF 41 at 104-7.

31. After the Officers searched the car and the trunk, at approximately 6:03 pm, Officer Hughes ordered a tow of the rental car. ECF 41 at 141.

32. Officers Hughes and Sherwood transported Bonner to the North Precinct. ECF 41 at 142; 147.

33. Bonner initially did not consent to giving an oral DNA sample, but later signed a consent form and provided two oral swabs. ECF 41 at 143; 145.

34. Officer Hughes later contacted Dollar again and obtained the phone number of Hali Porter. ECF 41 at 168.

35. Officer Hughes called Porter, who confirmed that Bonner was her good friend and that they had been dating. ECF 41 at 170.

36. The parties have stipulated that Porter gave Bonner permission to drive the rental car. ECF 34.

37. The Court does not find that Bonner intentionally used Porter "to procure a rental car by a fraudulent scheme for the purpose of committing a crime." *See Byrd*, *infra*.

38. The rental car contract states that "only authorized renters listed may drive the vehicle." ECF 21 Ex. E.

39. The rental car contract states: "[Insurance] of the renter, additional renter, or *anyone else* operating the vehicle shall be primary . . . ." ECF 21 Ex. E (emphasis added).

40. The rental car contract also states that "Dollar may repossess the Vehicle at Your cost, without demand, and terminate this Agreement if the Vehicle . . . is illegally parked, apparently abandoned, or used in violation of this Agreement." ECF 21 Ex. E.

41. The rental contract also states: "If you fail to return the Vehicle on the date and time due, Dollar has the right to notify law enforcement authorities that the Vehicle is stolen or missing." ECF 21 Ex. E.

42. Dollar never informed law enforcement authorities that the car was stolen or missing.

## CONCLUSIONS OF LAW

Bonner has moved to suppress all physical evidence seized during the course of the search of the rental car and all related statements made by Bonner. Based on the facts found by the Court and the applicable law, the Court makes the following conclusions.

### A. Consent to Search by Third Party

The Government argues that Dollar's consent to search and request that the police repossess the car defeated any reasonable expectation of privacy that Bonner had in the rental car. ECF 26. Bonner responds that the Supreme Court's decision in *Byrd* is dispositive in this case. *Byrd* held, "as a general rule, someone in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." 138 S. Ct. at 1524. In *Byrd*, the defendant, like Bonner, was the "sole occupant of a rental car." *Id.* at 1528. Like Byrd, Bonner "had stored personal effects" in the rental car. *Id.* at 1523.

The Government correctly points out, however, that there is a factual difference between *Byrd* and this case. In *Byrd*, after the defendant declined to consent to a search of that rental car that he was driving, the police "stated they did not need consent because he was not listed on the

rental agreement. The troopers then opened the passenger and driver doors" and searched the car. *Id.* at 1525. In this case, in contrast, the police did not search the car immediately after the officers made their own determination that Bonner was not listed on the rental agreement. Instead, before the police conducted the search, Officer Hughes spoke to Dollar employee Kyle Miller on the telephone, and Miller told the police that they had Dollar's permission to search the rental car and stated that Dollar "wanted the vehicle back."

The first issue for the Court, therefore, is whether Dollar's consent to search and request that the police repossess the car allowed the police to overcome Bonner's expectation of privacy and denial of consent. *Byrd* did not discuss whether a call from police to a rental-car agency to request consent to search and the agency's granting of that consent combined with a request that the car be repossessed may overcome the driver's express denial of consent.

The Court holds that Dollar's consent to search, even in combination with an attempt to exercise a private contractual right to repossession, did not overcome Bonner's reasonable expectation of privacy and denial of consent to search. The Supreme Court has made clear that "a physically present inhabitant's express refusal of consent to a police search [of a rental unit] is dispositive as to him, regardless of the consent of a fellow occupant." *Randolph*, 547 U.S. at 122-23. Although *Randolph* concerned a search of real property and consent by a co-occupant, and emphasized the special protection for privacy of the home, the Court noted that the analysis governing a third-party's authority to consent also governs a police search of personal property, such as a bureau drawer or duffel bag. *Id.* at 110-112 (citing *Frazier v. Cupp*, 394 U.S. 731, 740 (1969) ("[I]n allowing [his cousin to share use of a duffel bag] and in leaving it in his house, [the suspect] must be taken to have assumed the risk that [the cousin] would allow someone else to look inside.")).

The Supreme Court in *Randolph* reached its conclusion by considering the question of whether any customary understanding accords the consenting party authority powerful enough to prevail over the non-consenting party's objection. *Id.* at 121. The Supreme Court held that the physically present inhabitant's denial was dispositive as to him because:

> neither state-law property rights, nor common contractual arrangements, nor any other source points to a *common understanding of authority to admit third parties generally without the consent of a person occupying the premises.*

*Id.* (Emphasis added). Similarly, in the case of a rental car, there is no source that points to a "common understanding" of a rental-car agency's "authority to admit third parties generally without the consent" of the driver of that car. *Id.* In fact, Dollar had less "joint access" for most purposes over the rental car than the consenting co-tenant did to the apartment in *Randolph*, and such access may be dispositive in determining a third-party's ability to consent to a police search. *Warner*, 843 F.2d at 403. Further, *Byrd* makes clear that as a baseline principle, the unauthorized driver of a rental car has a reasonable expectation of privacy in the vehicle. 138 S. Ct. at 1531.

The Government's argument rests primarily on its assertion that because Dollar "exercised its lawful right to repossess the vehicle, any privacy interest held by defendant was extinguished." ECF 26. This assertion conflicts with binding precedent that the efficacy of third-party consent is *not* based on any "enduring and enforceable ownership right as understood by the private law of property, but is instead [based on] the authority recognized by customary social usage." *Randolph*, 547 U.S. at 120-21; *see also Matlock*, 415 U.S. at 171 n.7 (holding that third-party consent authority rests "on mutual use of the property by persons generally having joint access or control for most purposes."). Dollar may have attempted to effectuate its ownership right to possession of the rental car, but precedent makes clear that the efficacy of

third-party consent in the context of a search by law enforcement is not based on such an ownership right.

This conclusion is not inconsistent with the fact that Dollar, as a civil matter, was perhaps entitled to "repossess" the car under the terms of the contract. Nor would this conclusion prevent a rental-car agency from contacting the police if it suspected any criminal wrongdoing. Dollar's contractual right, however, does not give Dollar "authority recognized by customary social usage" to admit third parties, nor to allow the police to search a rental car over the express objection and denial of consent by a driver who has a legitimate and reasonable privacy interest in the car. *Byrd*, 138 S. Ct. at 1531; *Randolph*, 547 U.S. at 120-21. At most, Dollar had a private contractual right to exactly what the contract states: the right to repossess the car. The Government provides no authority explaining why concepts of personal property law or "common contractual arrangements" mean that this private contractual right also encompasses the right to admit third parties while the driver of the car is still in possession of the vehicle or the right to admit the police to search the car over the driver's express objection. *Randolph*, 547 U.S. at 112.

If the Government's position was correct, even the most minor contractual violation could be used to vitiate a rental-car driver's reasonable expectation of privacy and denial of consent to search. That is because the contract in this case allowed Dollar to "repossess the Vehicle" based on *any* "violation of the [rental] agreement." There is no customary understanding that a rental car agency may admit third parties when such a contractual violation occurs. *See Byrd*, 138 S. Ct. at 1529 (stating that "[f]ew would contend that violating provisions like [driving the car on unpaved roads or while using a cellphone] has anything to do with a driver's reasonable expectation of privacy in the rental car"). As *Byrd* noted, an expectation of

privacy is reasonable based on "concepts of real or personal property law or . . . understandings that are recognized and permitted by society." *Id.* at 1527. If there was a customary understanding that a rental agency could admit third parties in such circumstances, Byrd's expectation of privacy likely would not have been reasonable.

The Government seeks to avoid this precedent by arguing that Dollar's consent to search "followed Dollar's request that the officers return the car to it," and that this order of events means that Bonner no longer had a privacy interest in the car at the time of Dollar's consent, nor at the time of the police search. ECF 45. The Court rejects the Government's assertion, as the record evidence indicates that both Dollar employees understood that the primary question from law enforcement was whether law enforcement could search the car. Findings of Fact 21-22. Based on the record evidence, it is more probable than not that Dollar first granted law enforcement's request for consent to search and only later asked that the rental car be repossessed.

But even if Dollar had requested at the outset that the rental car be repossessed before granting consent to search, the cases that the Government cites for the proposition "that a reasonable expectation of privacy in borrowed property lasts only so long as the property's owner permits" are distinguishable. The Court, therefore, holds that Bonner maintained an expectation of privacy at the time of the police search. ECF 26. In each of the cases where a search was upheld, the "critical determination" was whether the property owner "had justifiably terminated [the defendant's] control of the [property] through private acts of dominion." *United States v. Bautista*, 362 F.3d 584, 590 (9th Cir. 2004); *see also United States v. Dorais*, 241 F.3d 1124, 1127-30 (9th Cir. 2001) (hotel engaged in "affirmative acts," including communicating checkout time to defendant, housekeeper knocked on door shortly after checkout time to inquire

when defendant would be checking out, and defendant stayed past stated time); *United States v. Huffhines*, 967 F.2d 314, 316 (9th Cir. 1992) (hotel's assistant manager had repossessed room and locked the defendant out before police involvement); *United States v. Haddad*, 558 F.2d 968, 975 (9th Cir. 1977) (defendant had been "ejected" from hotel by hotel management and had checked out before police involvement).

The Government cites no authority for the proposition that when the police affirmatively contact a rental car agency and the agency then requests that the police repossess the rental car, the police's act of repossession is a "private" act. Nor did *Dorais*, *Huffhines*, or *Haddad* make such a finding regarding any comparable communication and police action. *Accord United States v. Young*, 573 F.3d 711, 716-17 (9th Cir. 2009) ("hotel had not taken any affirmative act that was a clear and unambiguous sign of eviction").

The Eleventh Circuit considered that specific proposition and held the opposite, namely that when police affirmatively contact a rental car agency and the agency requests that the police repossess the vehicle, the police's assertion of control over the rental car is not "private action." *United States v. Cooper*, 133 F.3d 1394, 1401 (11th Cir. 1998). *Cooper* noted that the rental car agency "had not repossessed the rented property prior to the challenged search" and distinguished *Huffhines* because that case "involved repossession prior to the presence of law enforcement." *Id.* The panel noted that the rental agency "did not report the car stolen, seek an arrest warrant, issue notice of its intent to repossess or otherwise attempt to enforce any of its contractual or legal rights against Cooper at any time prior to the [highway patrol's] phone call." *Id.* The Eleventh Circuit stated that "[i]f we were to accept the government's position, a driver could not expect privacy in a rental car even one minute after the rental contract expired. In other words, the rental company's dormant right of repossession would govern the scope of the

driver's Fourth Amendment protections." *Id.* The Court, therefore, declines to hold that Dollar's attempt to effectuate its private contractual right to "repossess the Vehicle," made in response to a call from the police, "extinguished" Bonner's right to privacy, whether the request was made before or after Dollar's consent to search.

Bonner's denial of consent to search is dispositive. Bonner had a reasonable expectation of privacy in the rental car at the time of the police search. *Byrd*, 138 S. Ct. at 1531. Bonner, like the defendant in *Randolph*, was "physically present" at the scene and "expressly refuse[d] to consent" to the search. *Randolph*, 547 U.S. at 106. Further, Dollar did not have "mutual use of the property" nor "joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7. Dollar did not have "authority recognized by customary social usage" or another source that could validate the third-party consent in these circumstances. *Randolph*, 547 U.S. at 120-21. Dollar did not terminate Bonner's control of the rental car "through private acts of dominion." *Bautista*, 362 F.3d at 590. This is not a case where the third-party consent is valid based "on the consent-giver's unlimited access to property to sustain the search." *Kim*, 105 F.3d at 1582. The government, therefore, has not met its "burden of establishing" the effectiveness of a third party's consent. *Rodriguez*, 497 U.S. at 181.[1]

## B. Inevitable Discovery and Inventory Search

The Government also argues that had Dollar not consented to the search, the search would still have been valid pursuant to the inevitable discovery and inventory search doctrines.

---

[1] Because the Court holds that Bonner's physically present denial of consent to search was dispositive as to him as a matter of law, the apparent authority doctrine does not apply. *See Welch*, 4 F.3d at 764-65 (doctrine "applicable only if the facts believed by the officers to be true would justify the search as a matter of law"). The Court also finds that there was "an unbroken causal chain of events" from the unlawful search to the collection of Bonner's DNA, and therefore grants Bonner's motion to suppress the DNA sample. *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017).

The Government argues that a search was inevitable because "officers were in no position to resist Dollar's explicit request that they impound the car so that it could be returned to Dollar" and that even if Dollar had not consented to a search, the officers had no discretion but to impound and tow the vehicle, "which in turn would have triggered the inventory search exception." ECF 45 at 4; ECF 47.[2] The Government, however, expressly disclaims the argument that an inventory search did in fact occur, stating that "this case does not actually involve an inventory search," ECF 45 at 7, and that the Court need not consider the subjective motivations of law enforcement in this case.[3] *See Johnson*, 889 F.3d at 1126.

The inevitable discovery doctrine applies "if the government can prove that the evidence would have been obtained inevitably." *Reilly*, 224 F.3d at 994. The Government's underlying premise for why the evidence would have been obtained inevitably is that officers could not refuse Dollar's request that law enforcement impound the car. The Supreme Court, however, has recognized the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 761 (2005). The Supreme Court noted this discretion was

> illustrated by *Chicago v. Morales,* 527 U.S. 41 (1999), which involved an ordinance that said a police officer "'shall order'" persons to disperse in certain circumstances, *id.,* at 47, n. 2. This Court rejected out of hand the possibility that "the mandatory

---

[2] Bonner responds that the Portland Police Bureau's "Vehicle Disposition" policy allows officers to exercise discretion when deciding whether to order a tow based on a private request, ECF 48-1 at 4 (§ 7.3.1), and that the Bureau's "Search, Seizures, and Inventories" policy prohibits inventory searches for such "private request tows." ECF 48-2 at 2 (§ 4.1). Because the Court holds, as a matter of law, that the officers in this case had discretion as to how to respond to Dollar's private request, it does not need to address Bonner's factual contentions further.

[3] If the Court were to consider the subjective intentions of the law enforcement officers in this case, the Court would consider as most relevant Findings of Fact 3, 4, 5, 9, 11, 21, 22, 23 and 29. Because, however, the Government expressly disclaims the argument that there was an inventory search in this case, the Court does not reach this issue.

> language of the ordinance . . . afford[ed] the
> police *no* discretion." *Id.,* at 62, n. 32. It is, the Court proclaimed,
> simply "common sense that *all* police officers must use some
> discretion in deciding when and where to enforce city
> ordinances." *Ibid.* (emphasis added).

*Id.* Given the Supreme Court's holdings in the context of seemingly mandatory legislative commands, the Court finds that law enforcement must have as least as much discretion in determining how to respond to a private citizen's request for assistance based on a private contractual right. The "practical necessity for discretion" is obvious, given that there are many circumstances in which the police could reasonably decide not to effectuate such a request, including if the contract was disputed or if the dispute had not yet been adjudicated. *Id.* at 762. Because the Court finds that the police had discretion in determining how to respond to Dollar's request for repossession of the rental car, the Court rejects the Government's premise for why the discovery of evidence was inevitable. The Court, therefore, holds that the inevitable discovery doctrine does not apply.

## CONCLUSION

Bonner's Motion to Suppress (ECF 21) is GRANTED.

**IT IS SO ORDERED.**

DATED this 15th day of August, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge